IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

SUSIE BRAWHAW, BY AND THROUGH
MAGNOLIA HAYS, NEXT FRIEND, FOR
THE USE AND BENEFIT OF SUSIE BRAWHAW,　　　　　　　　　PLAINTIFF,

VS.　　　　　　　　　　　　　　　　　　　CIVIL ACTION NO. 2:04CV322-P-B

MARINER HEALTH CARE, INC., ET AL.,　　　　　　　　　　　DEFENDANT.

**MEMORANDUM OPINION**

This matter comes before the court upon Defendants' Motion to Exclude Opinions of Loren Lipson, M.D., Pursuant to Fed. R. Evid. 702 and For His Personal Bias [87]. After due consideration of the motion, the responses filed thereto, and the exhibits attached, the court is prepared to rule.

**I. FACTUAL BACKGROUND**

The plaintiff filed the instant action on August 24, 2004, alleging that the nursing home defendants were negligent in caring for Susie Brawhaw which proximately caused various injuries and death. Currently before the court is the defendants' motion to exclude the opinions of one of the plaintiff's medical experts, Loren Lipson, M.D.

The defendants argue that all of Dr. Lipson's opinions should be excluded because (a) he failed to show the bases for his opinions, (b) he failed to identify the standards of care that were breached, (c) he failed to account for Ms. Brawhaw's preexisting conditions, and (d) he is a "hired gun" who is personally biased in this case. Alternatively, the defendants argue that the court should exclude the allegedly new opinions Dr. Lipson gave in his March 21, 2008 deposition since these new opinions were not contained in the original expert report, nor was the expert report timely

1

supplemented.

In response to these arguments, the plaintiff counters that Dr. Lipson's report and his statements during his deposition gave ample notice of the bases for his opinions – *i.e.*, his "training, background, and what [he has] previously assimilated," Deposition of Dr. Lipson at 19, his 42 years of experience as a medical doctor specializing in geriatrics, as well as his review of the medical records. The plaintiff argues that in his report and deposition, Dr. Lipson clearly identified the applicable standards of care and explained why, in his opinion, he did not think that the plaintiff's preexisting conditions caused the injuries complained of in the instant suit. With regard to the defendants' "new opinions" argument, the plaintiff contends that these were not new opinions but rather additional examples given in support of the original fifteen opinions. Furthermore, the plaintiff argues, the report indicated that the opinions given therein where examples and, during the deposition, defense counsel on several occasions declined Dr. Lipson's offers to expand on his opinions of specific breaches of care. As to the "hired gun" argument, the plaintiff insists that Dr. Lipson's opinions are not based on personal bias, but rather his many years of experience and training in geriatrics which came to bear on the case the plaintiff presented to him.

## II. DISCUSSION

### A. Rule 702 Standards

Fed. R. Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The current text of Rule 702, as amended in 2000, reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals., Inc..*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). "In Daubert the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in Kumho clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science." Advisory Committee's Note on 2000 Amendment of Fed. R. Evid. 702.

For the court to be the arbiter of the validity of a given scientific theory is indeed a heavy burden. As Judge Kozinski observed:

> Our responsibility then, unless we badly misread the Supreme Court's opinion [in *Daubert*], is to resolve disputes among respected, well-credentialed scientists about matters squarely within their expertise, in areas where there is no scientific consensus as to what is and what is not 'good science,' and occasionally to reject such expert testimony because it was not 'derived by the scientific method.' Mindful of our position in the hierarchy of the federal judiciary, we take a deep breath and proceed with this heady task.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995).

Ultimately, the district court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert.*, 509 U.S. at 589. Under the familiar *Daubert/Kumho* standards and their progeny, it is not the court's duty to determine in a motion in limine to exclude an expert's testimony whether the expert in question is correct. This decision falls squarely within the province of the jury. Essentially, the court is the gate-keeper charged with determining whether the expert's testimony is reliable and relevant enough to not be junk science or mere paid-for opinions.

There are many factors to consider in whether to open the gate to an expert. These factors

begin with Fed. R. Civ. P. 26(a)(2)'s provisions regarding expert reports. Next come the primary factors under Fed. R. Evid. 702. To aid in considering the essentials of Rule 702, the decision in *Daubert* set forth several factors the courts should consider in its gate-keeping function. The Advisory Committee's Note on the 2000 of Rule 702 sets forth additional factors. For the purpose of clarity, the court will set forth all of the factors germane to considering whether to open the gate in the following manner:

**Fed. R. Civ. P. 26(a)(2)**

1. Did the expert turn in an expert report?

2. Did the expert report contain:

    (a) a complete statement of all opinions?
    (b) the basis and reasons therefor?
    (c) the data considered in forming the opinion?
    (d) any exhibits to be used as a summary of opinions?
    (e) the qualifications of the witness?
    (f) publications authored by witness in the last 10 years?
    (g) compensation
    (h) other cases in which the expert has testified in the last 4 years?

3. Were the expert disclosures made at least 90 days before trial? Or in the case of rebuttal evidence, within 30 days before trial?

4. Were the opinions supplemented pursuant to FRCP 26(e)(1) (with respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty [to supplement] extends to both information contained in the report and to information provided through a deposition of the expert and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due – usually 30 days before trial)?

**Fed. R. Evid. 702**

5. Is the witness qualified by knowledge, skill, experience, training, or education?

6. Is the testimony based on sufficient facts?

7. Is the testimony the product of reliable methods?

8. Did the witness apply those methods to the facts reliably?

### *Daubert* factors in determining Rule 702 requirements

9. Can or has the theory/technique been tested? Can the theory/technique be challenged or is it a subjective, conclusory approach?

10. Is the theory/technique subject to peer-review or publication?

11. Is there a known or potential rate of error of the theory/technique when applied?

12. Were standards and controls used?

### Advisory Committee Notes to 2000 Amendment of FRE 702 factors

13. Did the theory arise from litigation or independent research?

14. Is there "too great an analytical gap between the data and the opinion proffered," that is, does the theory "fit" with the facts of the case? *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

15. Did the expert adequately consider alternative explanations?

16. Was the expert "as careful as he would have been in his regular professional work outside his paid litigation consulting"? *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

17. Is the expert's field of expertise known to reach reliable results for the type of opinion proffered?

"[A] trial judge *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability ... the test of reliability is 'flexible,' and *Daubert*'s list of specific *factors neither necessarily nor exclusively applies to all experts or in every case.*" *Kumho*, 526 U.S. at 141 (1999) (emphasis in original). "The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide

whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Kumho*, 526 U.S. at 152. The district court has wide discretion in determining the admissibility of expert testimony, and its decision will be disturbed only for abuse of discretion. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 274 (5th Cir. 1998).

**B. Analysis of 702 Standards**

Below, the court will apply the relevant standards to the facts at hand. As discussed above, the ultimate question for this court is whether Dr. Lipson's opinions are reliable, not whether his opinions are correct. In determining this question, the court need not address all of the factors outlined above, nor do Dr. Lipson's opinions need to satisfy all of those factors.

**1. Rule 26(a)(2) standards**

Dr. Lipson did in fact turn in an expert report, dated January 5, 2008. As to whether it "contained a complete statement of all opinions," the report contained fifteen opinions regarding how Dr. Lipson believes the nursing home defendants were negligent in the care of Susie Brawhaw. All of these opinions offered examples in support of the opinions. During his deposition, however, Dr. Lipson clearly gave more examples in support of his original fifteen opinions. It was equally clear, however, that Dr. Lipson would have given many more examples had defense counsel not agreed that Dr. Lipson could truncate the specificity of his complaints regarding the plaintiff's care. Rule 26(a)(2)(B)(i) requires that the expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." However, Rules 26(a)(2)(D) and 26(e)(1) allow opinions to be supplemented as long as they are done by the time the party's disclosures under Rule 26(a)(3) are due – in this case, the discovery deadline of March 13, 2008. Though the

deposition of Dr. Lipson was not conducted until March 21, 2008 – a week after the discovery deadline – it was taken by agreement of the parties. Therefore, the defendants waived any argument that what was said in the deposition was untimely.

With regard to the Rule 26(a)(2) standards cited above, the court concludes that the expert did turn in an expert report which contained a complete statement of all his opinions (as supplemented by his deposition), the basis and the reasons for those opinions (*i.e.*, the standards of care set out in the report and referred to in the deposition and the reasons Dr. Lipson believed those standards were breached), and the data considered in forming the opinions (*e.g.*., Susie Brahaw's medical records, applicable standards of care, etc.). Furthermore, it is undisputed that the defendants were provided with information regarding Dr. Lipson's qualifications, publications within the last 10 years, his compensation, and other cases in which he has testified. The disclosures of Dr. Lipson were made at least 90 days before trial and, as discussed above, were timely supplemented.

The court notes, however, that the opinions and supporting examples given by Dr. Lipson during trial will be limited to those he disclosed in his report and deposition. Even though defense counsel agreed to allow Dr. Lipson to limit the level of specificity of his opinions during the deposition, the purpose of the discovery rules regarding experts is to prevent ambush at trial with wholly new opinions and/or bases or examples therefor.

**2. Fed. R. Evid. 702 Standards**

It is undisputed that Dr. Lipson is qualified by his knowledge, skill, experience, training, and education in geriatrics. The court concludes that Dr. Lipson's opinions are based on sufficient facts – *i.e.*, Susie Brawhaw's medical records. The opinions were also arrived at by reliable methods since Dr. Lipson used the applicable standards of care, which he discussed in his report and deposition,

and applied those standards in a reliable manner to what he saw in Ms. Brawhaw's medical records.

### 3. *Daubert* Factors

Dr. Lipson's primary theory – *i.e.*, that the standard of care evinced in Ms. Brawhaw's medical records did not conform to the proper standards of care – is not a unique theory requiring testing, nor is it a subjective, conclusory approach. The theory itself does not require peer-reviewed publications validating the theory, nor is it necessary to question whether there is a potential rate of error of the theory when applied or whether standards and controls were used. Stated simply: the theory of whether standards were conformed with in a given patient's care is reliable enough to be presented to a jury.

### 4. Advisory Committee Notes to 2000 Amendment of FRE 702 Factors

Though Dr. Lipson's theory as applied in this case arose from the instant litigation, the theory itself that failure to conform to applicable standards of care in a nursing home can cause injury is not dependent upon any particular litigation. Therefore, this is not a case in which an expert created a theory and methodology solely for litigation.

Pursuant to *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the defendants have not demonstrated that there is "too great an analytical gap between the data and the opinion offered."

The defendants argue that Dr. Lipson did not adequately consider alternative explanations for Susie Brawhaw's injuries – *i.e.*, her preexisting conditions. Dr. Lipson addressed her preexisting conditions during his deposition and opined that many of those conditions would not have developed as they did but for the defendants' alleged negligence. The defendants are free to cross examine Dr. Lipson in this regard.

**C. Personal Bias**

The defendants also argue that Dr. Lipson should not be allowed to testify because he is a "hired gun" who during one year made almost $1 million for testifying as an expert witness in similar matters and who has worked on many occasions for the plaintiff's law firm.

All expert witnesses are hired and paid. There is a danger that in some cases, certain experts will proffer opinions that are more likely the product of a bias against a certain industry rather than of reliable and relevant analysis. However, the court's primary duty in its gate-keeping function is to determine whether the witness is qualified and whether his opinions are relevant and reliable, not whether the witness has a personal bias. The court has concluded in this case that Dr. Lipson is qualified to give his opinions and that those opinions are reliable enough to go to the jury. Therefore, the defendants are free to bring out any alleged personal bias during cross examination.

### III. CONCLUSION

For the reasons discussed above, the court concludes that Defendants' Motion to Exclude Opinions of Loren Lipson, M.D., Pursuant to Fed. R. Evid. 702 and For His Personal Bias [87] should be denied. The court cautions, however, that Dr. Lipson's testimony will be limited to that which he discussed in his expert report and deposition. Accordingly, and Order shall issue forthwith, **THIS DAY** of May 8, 2008.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE